### UNITED STATES

v.

### EXTREME ASSOCIATES, INC., Robert Zicari, and Janet Romano, Defendants.

Crim. No. 03–0203.

United States District Court, W.D. Pennsylvania.

Jan. 20, 2005.

---

**35.** *United States v. Bucaro,* 898 F.2d 368 (3d Cir.1990).

**36.** *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Stephen R. Kaufman, United States Attorney's Office, Pittsburgh, PA, for Plaintiff.

Jennifer M. Kinsley, Sirkin, Pinales, Mezibov & Schwartz, H. Louis Sirkin, Cincinnati, OH, Warner Mariani, Pittsburgh, PA, for Defendants.

## MEMORANDUM

LANCASTER, District Judge.

This is a criminal prosecution charging nine counts of violating the federal obscenity statutes and one count of conspiracy based on that conduct. 18 U.S.C. §§ 371, 1461, 1462 and 1465. The United States has charged defendants Extreme Associates, Inc., Robert Zicari, and Janet Roma-

no with distribution of obscene material via the mails and the Internet. Defendants are in the business of producing and selling sexually explicit films. Defendants have filed a motion to dismiss the indictment arguing that the federal obscenity laws infringe on the rights of liberty and privacy guaranteed by the due process clause of the United States Constitution. [Doc. Nos. 14 and 15].

Because we find that the obscenity statutes are unconstitutional as applied to these defendants, defendants' motion to dismiss is granted.

## I. FACTUAL BACKGROUND

### A. Joint Stipulation of Facts

The parties submitted the following "Joint Stipulation of Fact" prior to oral argument. Additional facts not in dispute will be discussed in this memorandum in context.

Facts Regarding the Internet Generally:

1. The Internet is a decentralized, global medium of communication that links people, institutions, corporations, and governments around the world. It is a giant computer network that interconnects innumerable smaller groups of linked computer networks and individual computers. Although precise estimates are difficult to formulate due to its constant and rapid growth, the Internet is currently believed to connect more than 159 countries and close to 322 million users worldwide.

2. Because the Internet merely links together numerous individual computers and computer networks, no single entity or group of entities controls all of the material made available on the Internet or otherwise limits the ability of others to access such materials. The range of digital information available to Internet users—which includes text, images, sound and video—is individually created, maintained, controlled, and located on millions of separate individual computers around the world.

Each content provider of a web site is responsible for its content.

3. The Internet presents extremely low entry barriers to anyone who wishes to provide or distribute information or gain access to it. The Internet provides an affordable means for communicating with, accessing, and posting content to a worldwide audience.

4. In the United States, individuals have several easy means of gaining access to computer communications systems in general and to the Internet in particular. Many educational institutions, businesses, local communities, and libraries maintain an easily accessible computer network which is linked directly to the Internet. Many of these entities restrict access to sexually explicit material.

5. Internet service providers ("ISPs") allow subscribers to access the Internet through the subscriber's personal computer by using a telephone modem, broadband, including a cable modem or digital subscriber line (DSL), and dedicated access, such as a T1 line. Most ISPs charge a monthly fee in the range of $15.00 to $50.00, but some provide their users with free or very low-cost Internet access. Every ISP has a Terms of Service Agreement with those customers that desire to host content, in the form of a web site, on the ISP's network. The Terms of Service Agreement may prohibit the individual or entity (customer) hosting a web site from posting certain material such as child pornography or sexually explicit content, on the ISP's network.

Subscribers who do not host a web site, but utilize the ISP to access the Internet, also enter into a Terms of Service Agreement which may limit certain activities.

6. The World Wide Web is the most popular technology to access information on the Internet. Anyone with access to

the Internet and proper software can create webpages or home pages which may contain many different types of digital information—text, images, sound, and video. The web comprises millions of separate websites that display content provided by particular persons or organizations. Any Internet user anywhere in the world with the proper software can view webpages posted by others, read text, view images and video, and listen to sounds posted at these web sites. Internet users wishing to make content available to others must create the content and publish it on the Internet through an ISP.

7. The web serves in part as a global, online repository of knowledge, containing information from a diverse array of sources, which is easily accessible to Internet users around the world. Though information on the web is contained on individual computers, each of these computers is connected to the Internet through a web protocol, the hyper text transport protocol, that allows the information on the web to be accessible to web users. The content of some web sites is available to all users while other content may not be accessible without a method of access, such as a login code, chosen by the web site host.

8. To gain access to the information available on the web, a person generally uses a web "browser"—software such as Netscape Navigator or Internet Explorer—to display, print, and download documents that are formatted in the standard web formatting language. Each page on a web site has an address that allows users to find and retrieve it.

9. Most web documents also contain "links." These are short sections of text or images that refer and link to another document. Typically the linked text is blue or underlined when displayed; and when selected by the user on the user's computer screen, the referenced document is automatically displayed, wherever in the world it actually is stored. Links, for example, are used to lead from overview documents to more detailed documents on the same website, from tables of contents to particular pages, and from text to cross-references, footnotes, and other forms of information.

10. Links may also take the user from the original website to another website on a different computer connected to the Internet, a computer that may be located in a different area of the country, or even the world.

Facts Regarding This Case During All Times Relevant to the Charges in this Case:

11. Extreme Associates, Inc. operated a website known as www.extremeassociates.com. The website was divided into two sections—one section which could be accessed by the general public without cost and one section for members only. The "members only" section required a payment of $89.95 for a three month period, renewable automatically.

12. To become a member of the Extreme Associate's website, an individual must have completed an on-line registration form which includes the following: 1) name; 2) address; and 3) credit card information. Once the form was completed, the potential member clicked the "submit" button. If Extreme Associates accepted the applicant as a member, it then provided a user name and password to the new member and billed his credit card every three months.

13. Once an individual was a member of the Extreme Associates website, he or she was permitted to access "members only" content from any computer worldwide. To do so, the member was only required to enter a username and password. Extreme Associates did not require the member to disclose the geographic location of the computer he or she was us-

ing. Extreme Associates did not request entry of a geographic location from persons logging into the "members only" portion of its site.

14. The "members only" portion contained multiple webpages, or screens, which were comprised of various headings, photographs, text, and computerized images. Also available on the "members only" portion of the website were short video clips which ranged from less than one minute in length to several minutes in length. The hyperlinks to these video clips appeared on a webpage with various other content, including text and graphic design.

15. The video clips could be accessed by clicking on them with a mouse and viewing them with a video processing program, such as Real Time or Windows Media. Any video clips could be downloaded by the member and saved onto the member's personal computer, so that the member could view the video clip at any time without accessing the Extreme Associates website or even connecting to the Internet.

16. Some of the video clips that appeared on the Extreme Associates website were excerpts from full length videos produced, distributed, and/or sold by Extreme Associates; others were not. However, the web page containing the video clips did not reference any full length video, nor whether such videos were available on VHS or DVD. Where the video clip was in fact an excerpt from a full-length video, the full-length video was available for purchase on another page of the Extreme Associates website.

17. The defendants selected the length and chose the content of each video clip available on the "members only" portion of the Extreme Associates web site.

18. As part of the investigation of this case, United States Postal Inspector Joseph McGowan registered as a member of the Extreme Associates website. More specifically, on September 5, 2002, Postal Inspector McGowan subscribed to the Extreme Associates membership website. He did it in the following manner:

He went to the extremeassociates.com website and clicked on to the member's registration. That brought him to the ccbill.com page. The page reflected ccbill.com letterhead and had "instant online access with your credit card." On this page, it asked for the following information: first name, last name, address, city, state, postal code, phone number, country, email address, credit card number, cvv2, expires, card type, name on card, subscription options, user name, password, and confirmation password. Inspector McGowan provided the following information:

NAME: Kim Wallace

ADDRESS: P.O. Box 97261 Pittsburgh, PA 15229

EMAIL ADDRESS: kwallball@hotmail.com

CREDIT CARD NUMBER: 5424 1805 1478 2595

CVV2: 250

NAME ON CARD: Kim Wallace

SUBSCRIPTION OPTIONS: In dropdown box 1 Selected 90 day at $89.95

USER NAME: WALLBALL

PASSWORD: Pirates

CONFIRMED PASSWORD: Pirates

After he filled out the information pertaining to his credit card, it then brought him to the next page for ccbill. com:

CREDIT CARD AND CHECK BILLING Account: 913289–0000.

www.extremeassociates.com

Credit card online check—After checking "OK," the next page appeared which read, "Before Continuing, Please Make Sure the Following Information is Correct." USAGE OF INVALID AD-

DRESSES OR PHONE NUMBERS MAY RESULT IN A REJECTION OR A CANCELLATION. PLEASE USE ACCURATE INFORMATION. Your IP address (209.195.149.28) is recorded with this transaction. Fraudulent transactions will be investigated. Credit Card Number: 5424 1805 1478 2595 Expires: 08/2004

Name: Kim Wallace Address: P.O. Box 97261 Pittsburgh, PA 15229 US–United States. You may cancel your membership automatically at any time by clicking the Customer Support button located on the bottom of the sign up form. Your card will be billed $89.95 for a 90 day membership and automatically renewed for $89.95 every 90 days thereafter for your convenience. Hit "back" on your browser to correct errors, or Click the button below if the info is correct. Postal Inspector McGowan clicked on the "information is correct" button and continued to the next page. He was then able to access Extreme Associates "Club Extreme."

19. Postal Inspector McGowan received an instant message on September 5, 2002 from support@ccbill.com to kwallball@hotmail.com, with subject, subscription number 1029955162. Underneath the Subject Line is www.extremeassociates.com:

Welcome.

Thank you for your purchase at www.extremeassociates.com. Your card has been billed as CCBILL Ltd. for the amount of 89.95. Your subscription number is 913589–0000–1029955162.

Please include this number in all correspondence.

Your User Name is—wallball

Your Password is—pirates

If you selected an automatically rebilled option your subscription will automatically be renewed for your convenience until you cancel.

Your next billing amount will be 89.95 on 12/05/2002.

Please save this receipt while your subscription is in effect.

You may see your billing status, renewal dates and look up your password if you lose it by visiting— http://www.extremeassociates.com/ccbill/.

You may also cancel your subscription or email us at these links:

**http://www.extremeassociates.com/ccbill**

http://www.ccbill.com/system/support.cgi support@ccbill.com

FOR PROMPT SERVICE PLEASE INCLUDE YOUR SUBSCRIPTION NUMBER IN ALL CORRESPONDENCE.

Your subscription number is 1029955162. Billing services provided by CCBILL Ltd. **billing@ccbill.com**.

20. The address provided by Inspector McGowan is located within the Western District of Pennsylvania. Inspector McGowan and/or his fellow postal inspectors viewed the "members only" content available on the website during the course of their investigation. The "members only" content was accessed each time from a personal computer located in the Western District of Pennsylvania.

21. Within the "members only" portion of the website, Inspector McGowan and/or his fellow postal inspectors viewed video clips available on the Extreme Associates website. These clips included the following: 1) valeriejospit.wmv, a 2 minute 54 second video clip; 2)jewel.mpeg, a 37 second video clip; 3) PZSummerBreeze.mpeg, a 1 minute 49 second video clip; 4) dpgangbang7–genX.mpeg, a 1 minute 16 second video clip; 5) miacum.mpeg, a 1 minute 21 second video clip; and 6) analasspirationsl.mpeg, a 58 second video clip. The

video clips were located within the following areas of the "members only" portion of the Extreme Associates web site:

> *The Piss Zone*
> "valeriejospit.wmv"
> "jewel.mpeg"
> "PZSummerBreeze.mpeg"
> Double Penetration
> "dp–gangbang7–genX.mpeg"
> *The Ex–Factor*
> "miacum.mpeg"
> "analasspirationsl.mpeg"

Additional content was available within each of the above listed areas of the "members only" portion of the website.

22. The video clips listed in the preceding paragraph are referenced in counts 5 through 10 of the indictment.

23. The video clips viewed by Inspector McGowan on the Extreme Associates website can only be accessed, in the first instance, by an internet accessible device.

### B. *Procedural Background of Case*

On August 6, 2003, a federal grand jury returned a ten count indictment against Extreme Associates, Inc., Robert Zicari and Janet Romano. Defendants are accused of violating the federal obscenity statutes, 18 U.S.C. §§ 1461, 1462 and 1465, by distributing, either through the mail or over the Internet, certain motion pictures that are allegedly obscene. The federal obscenity statutes, 18 U.S.C. §§ 1461, 1462, 1465, proscribe the use of the mails, express delivery services or interactive computer services for the transportation or delivery of obscene material.

Section 1461 states:

Every obscene, lewd, lascivious, indecent, filthy or vile article, matter, thing, device, or substance ... [i]s declared to be nonmailable matter and shall not be conveyed in the mails or delivered from any post office or by any letter carrier. Whoever knowingly uses the mails for the ... delivery of anything declared by this section ... to be nonmailable ... shall be fined under this title or imprisoned not more than five years, or both, for the first such offense, and shall be fined under this title or imprisoned not more than ten years, or both, for each such offense thereafter.

18 U.S.C. § 1461.

Section 1462 states:

Whoever brings into the United States ... or knowingly uses any express company or other common carrier or interactive computer service ... for carriage in interstate or foreign commerce—(a) any obscene, lewd, lascivious, or filthy book, pamphlet, picture, motion-picture film, paper, letter, writing, print, or other matter of indecent character; or (b) any obscene, lewd, lascivious, or filthy phonograph recording, electrical transcription, or other article or thing capable of producing sound ... or [w]hoever knowingly takes or receives, from such express company or other common carrier or interactive computer service ... any matter or thing the carriage or importation of which is herein made unlawful—[s]hall be fined under this title or imprisoned not more than five years, or both, for the first such offense and shall be fined under this title or imprisoned not more than ten years, or both, for each such offense thereafter.

18 U.S.C. § 1462.

Section 1465 states:

Whoever knowingly transports or travels in, or uses a facility or means of, interstate or foreign commerce or an interactive computer service ... in or affecting such commerce for the purpose of sale or distribution of any obscene, lewd, lascivious, or filthy book, pamphlet, picture, film, paper, letter, writing, print, silhouette, drawing, figure, image, cast, phonograph recording, elec-

trical transcription or other article capable of producing sound or any other matter of indecent or immoral character, shall be fined under this title or imprisoned not more than five years, or both . . .

18 U.S.C. § 1465.

Counts two through four of the indictment are based on defendants' mailing of three video tapes to an undercover United States postal inspector in Pittsburgh. The inspector ordered those video tapes from defendants via their website. Counts five through ten are based on defendants' delivery of video clips over the Internet to that same undercover postal inspector. The inspector requested these particular clips after purchasing a monthly membership to the limited-access, members-only section of Extreme Associates' website. Count one is a conspiracy charge based on the above conduct. All counts are felonies and carry with them possible penalties of imprisonment for up to five years and various fines. Defendants have pled not guilty to all charges.

On October 9, 2003, defendants filed a motion to dismiss. After briefing the motion to dismiss, the court set oral argument for September 10, 2004. The parties twice requested that this date be rescheduled. Oral argument was heard on November 1, 2004.

Immediately following oral argument, the government informed the court that it was not prepared to argue the issue of whether the strict scrutiny test applied in this case and, if so, what the compelling state interest justifying the federal obscenity statutes was. Therefore, the government asked for the opportunity to file an additional brief. Defense counsel made no objection, and the parties were given forty-five days in which to brief that limited issue. All submissions have now been made and considered by the court.

Defendants do not dispute, for purposes of this motion, that the films involved in this case are obscene within the meaning of sections 1461, 1462 and 1465 and as that term is defined in *Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

## II. *STANDARD OF REVIEW*

■ Defendants have moved to dismiss the indictment on the ground that the federal obscenity statutes infringe on the constitutional guarantees of liberty and privacy secured by the due process clause. Where a statute is deemed unconstitutional, an indictment based thereon must be dismissed. *See e.g. United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

Courts use one of two tests to assess the constitutionality of statutes that are faced with a substantive due process challenge: the strict scrutiny test or the rational basis test. Therefore, we must first determine which test should be applied in this case.

■ Where a law restricts the exercise of a fundamental right, we apply the strict scrutiny test. *Lawrence v. Texas*, 539 U.S. 558, 593, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (Scalia, J., dissenting) (citing *Washington v. Glucksberg*, 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)); *Roe v. Wade*, 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (citations omitted); *Alexander v. Whitman*, 114 F.3d 1392, 1403 (3d Cir.1997). Under the strict scrutiny test, a statute withstands a substantive due process challenge only if the state identifies a compelling state interest that is advanced by a statute that is narrowly drawn to serve that interest in the least restrictive way possible. *Id.* In other words, even if the government has a state interest that rises to the level of being compelling, if there is a less restrictive

way to advance it, the statute fails this test.

■ Where it is not a fundamental right that is restricted, we apply the rational basis test. *Lawrence,* 539 U.S. at 593, 123 S.Ct. 2472; *Glucksberg,* 521 U.S. at 767 n. 9, 117 S.Ct. 2258 (Souter, J., concurring); *Alexander,* 114 F.3d at 1403. Under the rational basis test, a statute withstands a substantive due process challenge if the government identifies a legitimate state interest that the legislature could reasonably conclude was served by the statute. *Alexander,* 114 F.3d at 1403 (citing *Sammon v. New Jersey Board of Medical Examiners,* 66 F.3d 639, 645 (3d Cir.1995)); *see also Lawrence,* 539 U.S. at 593, 123 S.Ct. 2472. It is not enough under the rational basis test, however, for the government to simply announce some theoretical and noble purpose behind the statute. Rather, the statute must reasonably advance that purpose in order for the statute to survive even this deferential test. *See Reno v. Flores,* 507 U.S. 292, 319, 113 S.Ct. 1439, 123 L.Ed.2d 1 (1993).

## III. *DISCUSSION*

### A. *Defendants' Contentions*

Defendants contend that the federal obscenity statutes are unconstitutional because they infringe on the fundamental rights of liberty and privacy guaranteed by the United States Constitution. Specifically, defendants contend that there is a broad fundamental right to sexual privacy, which encompasses a right to possess and view sexually explicit material in the privacy of one's own home. Defendants argue that this right is not diminished by the fact that the material viewed is without literary or artistic merit or inspires lewd or lascivious thoughts in the mind of the viewer. Defendants contend that this right arises from the holdings in two Supreme Court cases: *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) and *Stanley v. Georgia,* 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969).

Defendants further argue that because the federal obscenity laws place a complete ban on the distribution of materials that an individual has the fundamental right to possess and view in private, the statutes should be subjected to the strict scrutiny test. Finally, defendants contend that the federal obscenity statutes fail both the strict scrutiny test and the rational basis test because, after *Lawrence,* the government can no longer justify legislation with enforcement of a "moral code."

### B. *The Government's Contentions*

The government contends that because the federal obscenity statutes have withstood constitutional attack for more than thirty-five years, this court lacks the authority to find that they are unconstitutional. On the merits, the government argues that there is no fundamental right involved in this case and that this court should not create a "new" fundamental right to commercially distribute obscene material. According to the government, the Supreme Court did not subject Texas' sodomy law to the strict scrutiny test in *Lawrence,* and therefore, there is no basis to subject the federal obscenity statutes to that exacting level of constitutional scrutiny. Instead, the government argues that the rational basis test should be applied, and that under that test, legitimate governmental interests justify the law.

### C. *The Court's Ruling*

Because we find that the federal obscenity statutes place a burden on the exercise of the fundamental rights of liberty, privacy and speech recognized by the Supreme Court in *Stanley v. Georgia,* we have applied the strict scrutiny test.

We find that the federal obscenity statutes do not survive the strict scrutiny test

as applied to the circumstances of this case. First, we find that after *Lawrence,* the government can no longer rely on the advancement of a moral code *i.e.,* preventing consenting adults from entertaining lewd or lascivious thoughts, as a legitimate, let alone a compelling, state interest. Second, we find that, as applied to the particular circumstances of this case, the laws are not narrowly drawn to advance the government's two asserted interests: 1) protecting minors from exposure to obscene materials; and 2) protecting unwitting adults from inadvertent exposure to obscene materials. As such, we find that as applied to this case, the federal obscenity statutes violate the constitutional guarantees of personal liberty and privacy of consenting adults who wish to view defendants' films in private. Accordingly, the indictment will be dismissed.

### D. *Standing*

█ As an initial matter, although not raised by the parties, we address the issue of standing. According to defendants, the federal obscenity statutes are unconstitutional because they infringe on an individual's fundamental right of liberty to engage in private, consensual sexual activity—such as possessing and viewing obscene materials—in the privacy of his own home. Defendants, however, are not before us as persons indicted for their private sexual conduct, or their private viewing habits. Rather, they are being prosecuted as vendors of sexually obscene materials. As such, we will address the question of defendants' standing to mount this constitutional defense.

The Supreme Court has consistently found that vendors have the ability to challenge the constitutionality of a statute on their customers' behalf where such statutes are addressed directly to the activity of the vendors. In the seminal case of *Craig v. Boren,* a seller of beer was deemed to have standing to argue that a

state statute prohibiting the sale of beer to men, but not women, of a certain age violated its customers' equal protection rights. *Craig v. Boren,* 429 U.S. 190, 192–97, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). Similarly, the Supreme Court found in *Carey v. Population Services International,* that defendant, a mail-order retail business engaged in the sale of non-medical contraceptives, had standing to assert that a state law prohibiting the distribution of non-medical contraceptives by anyone other than a licensed pharmacist violated its customers' substantive due process right to use such devices. *Carey v. Population Services International,* 431 U.S. 678, 682–84, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). In so holding, the Court stated that "PPA is among the 'vendors and those in like positions (who) have been uniformly permitted to resist efforts at restricting their operations by acting as advocates for the rights of third parties who seek access to their market ...'" *Id.* at 684, 97 S.Ct. 2010; *see also Williams v. Attorney General of Ala.,* 378 F.3d 1232, 1234 n. 3 (11th Cir.2004) (vendors of sexual toys/devices have standing to challenge constitutionality of state statute prohibiting commercial distribution of such devices).

The fact that defendants have raised this challenge in the context of a criminal case does not change the result. In *Carey,* the Supreme Court rejected an argument that defendant could not raise its constitutional challenge to the statute until *after* it had been criminally prosecuted under the statute. Finding that defendant had been twice cited for violations of the law, and had been explicitly threatened with criminal prosecution, the Supreme Court allowed PPA's challenge to the statute to move forward without awaiting criminal prosecution. *Carey,* 431 U.S. at 682–83, 97 S.Ct. 2010; *see also Griswold v. Connecticut,* 381 U.S. 479, 481, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (allowing doctors who

had been prosecuted for aiding and abetting the violation of a state statute prohibiting the use of contraceptives to challenge the constitutionality of that law).

Defendants have already been prosecuted under the federal obscenity statutes. Their challenge to the laws is ripe. Under well-established Supreme Court precedent, they have standing to assert that the federal obscenity statutes are unconstitutional because they place a burden on their customers' substantive due process rights to liberty and privacy.

### E. Substantive Due Process and the "The Right to Privacy"

■ The Supreme Court has recognized that one aspect of the liberty mentioned in the Due Process Clause of the Fifth Amendment is a "right of personal privacy". *Roe v. Wade,* 410 U.S. at 152, 93 S.Ct. 705. It was this "zone of privacy" that formed the basis of the Supreme Court's decision striking down a state law that prohibited the use of contraceptives. *Griswold v. Connecticut,* 381 U.S. 479, 485–86, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Supreme Court found that the statute was unconstitutional because it invaded the area of protected privacy surrounding the marital relationship. *Id.*

Both before and after that decision, the Supreme Court has used the substantive due process right of privacy to strike down laws restricting the right to marry, the right to have children, the right to direct the education and upbringing of one's children, the right to use contraception, the right to have an abortion, and the right to refuse unwanted lifesaving medical treatment. *See Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967); *Skinner v. Oklahoma ex rel. Williamson,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992); *Cruzan v. Dir., Mo. Dept. of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990).

### F. Obscenity Case Law
#### 1. Stanley v. Georgia

In 1957 the Supreme Court announced that "obscenity is not within the area of constitutionally protected speech" under the First Amendment. *Roth v. United States,* 354 U.S. 476, 485, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957). Twelve years later, however, the Supreme Court held that a state could not make the mere private possession of obscene material in one's home a crime. *Stanley v. Georgia,* 394 U.S. 557, 568, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969). In doing so, the Court did not hold that obscene material had become protected speech. Rather, the Court recognized that freedom of speech goes beyond self-expression and includes the fundamental right to "receive information and ideas regardless of their social worth." *Id.* at 564, 89 S.Ct. 1243; *see also Griswold v. Connecticut,* 381 U.S. at 482, 85 S.Ct. 1678 ("The right to freedom of speech . . . includes not only the right to utter or to print, but the right to . . . receive, the right to read and freedom of . . . thought").

The Supreme Court also determined that the Georgia statute, which criminalized the mere private possession of obscene material, raised a privacy issue as well. The Court stated, "[i]f the First Amendment means anything, it means that a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Id.* at 565, 89 S.Ct. 1243. To permit the

government to do so would support the "... assertion that the State has the right to control the moral content of a person's thoughts. To some, this may be a noble purpose, but it is wholly inconsistent with the philosophy of the First Amendment." *Id.* at 565–66, 89 S.Ct. 1243. Moreover, the Supreme Court explicitly found that this right to read or observe or think about what one pleases in his own home was "fundamental to our scheme of individual liberty." *Id.* at 568, 89 S.Ct. 1243.

Although the Georgia statute in *Stanley* prohibited possessing material of a sexually explicit nature, the analysis and result would have been the same had the Georgia statute criminalized the possession of Communist tract literature, or racist hate literature, or a copy of George Orwell's *1984,* or any other material the government deemed inappropriate for citizens to learn or think about. Therefore, *Stanley* represents a unique intersection between the substantive due process clause's protection of personal liberty and privacy and the First Amendment's protection of an individual's right to receive, and consider, information and ideas.

### 2. *Post–Stanley Obscenity Case Law*

The government correctly notes that after *Stanley* established the right to privately possess obscenity in one's home, the Supreme Court repeatedly refused to recognize a correlative First Amendment right to distribute such material. *See United States v. Reidel,* 402 U.S. 351, 91 S.Ct. 1410, 28 L.Ed.2d 813 (1971) (holding that there is no First Amendment right to distribute obscene material); *United States v. Thirty–Seven (37) Photographs,* 402 U.S. 363, 91 S.Ct. 1400, 28 L.Ed.2d 822 (1971) (holding that there is no "First Amendment right to do business in obscenity and use the mails in the process"); *United States v. 12 200–Ft. Reels of Super 8mm. Film,* 413 U.S. 123, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973) (same); *United States*

*v. Orito,* 413 U.S. 139, 93 S.Ct. 2674, 37 L.Ed.2d 513 (1973) (holding that *Stanley's* right to private possession of obscene material does not give rise to an independent First Amendment right to transport such materials in interstate commerce). Each holding, however, was based on the settled rule established in *Roth* that obscenity is not protected speech under the First Amendment. The motion in this case, however, does not raise a First Amendment challenge to the federal obscenity statutes; it raises a substantive due process challenge. The fact that the obscenity statutes have been upheld under one constitutional provision does not mean that they are immune from all constitutional attack. *See e.g. Boos v. Barry,* 485 U.S. 312, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988) (statute did not violate the Equal Protection Clause, but did violate the First Amendment); *see also R.A.V. v. City of St. Paul,* 505 U.S. 377, 383–84, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) (finding that the fact that obscenity is not protected speech under the First Amendment does not mean that it is "entirely invisible to the Constitution").

Apart from the fact that the holding in each of these cases was based on the First Amendment, these cases are also distinguishable on their facts. In *Orito* the Court engaged in a rational basis analysis and held that the obscenity statutes could be justified as a method of protecting the public morality, a justification no longer valid after *Lawrence. Orito,* 413 U.S. at 143–44, 93 S.Ct. 2674 (obscenity laws are a way to prevent the spreading of "evil" of a "moral nature"). Furthermore, *Thirty–Seven Photographs* and *12 200–Ft. Reels* dealt additionally with the government's special need to impose regulations at its borders regarding customs and imports. *Thirty–Seven Photographs,* 402 U.S. at 376–77, 91 S.Ct. 1400 (finding that obscenity is not protected speech and Congress

may declare it to be contraband and prohibit its importation); *12 200–Ft. Reels,* 413 U.S. at 125, 93 S.Ct. 2665 (stating that "[i]mport restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations").

Neither the Supreme Court nor the Court of Appeals for the Third Circuit has considered a substantive due process challenge to the federal obscenity statutes by a vendor arguing that the laws place an unconstitutional burden, in the form of a complete ban on distribution, on an individual's fundamental right to possess and view what he pleases in his own home, as established in *Stanley.* Therefore, contrary to the government's position, defendants' challenge is not precluded by *Roth, Reidel, Thirty–Seven Photographs, Orito,* and *200–Ft. Reels,* but is instead guided by cases such as *Stanley, Griswold v. Connecticut, Roe v. Wade,* and *Lawrence v. Texas.*

### G. *Lawrence v. Texas*

Recently, in a much publicized and analyzed case, the Supreme Court relied on a substantive due process analysis to strike down Texas' homosexual sodomy law. *Lawrence v. Texas,* 539 U.S. 558, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003). The decision opens with the Court's declaration that "[l]iberty protects the person from unwarranted government intrusions into a dwelling or other private places." *Id.* at 562, 123 S.Ct. 2472. After a discussion of *Griswold, Eisenstadt, Roe v. Wade* and other right of privacy cases, the Supreme Court found that a person's decisions about what personal relationships, including homosexual relationships, he will have in his own home are not to be controlled or criminalized by the government because the government finds such relationships to be immoral. *Id.* at 564–66, 578–79, 123 S.Ct. 2472. Instead, the Court deemed

such decisions to lie within a "realm of personal liberty which the government may not enter." *Id.* at 578, 123 S.Ct. 2472 (citing *Casey,* 505 U.S. at 847, 112 S.Ct. 2791).

Because the case involved two consenting adults engaged in sexual activity in the privacy of their own home and not minors, persons who might be coerced or injured, public conduct, or prostitution, the Court found that no state interest—including promoting a moral code—could justify the law's intrusion into the personal and private life of the individuals involved. *Id.* at 578, 123 S.Ct. 2472.

In a dissenting opinion joined by Chief Justice Rehnquist and Justice Thomas, Justice Scalia opined that the holding in *Lawrence* calls into question the constitutionality of the nation's obscenity laws, among many other laws based on the state's desire to establish a "moral code" of conduct. *Lawrence,* 539 U.S. at 590, 123 S.Ct. 2472 (Scalia, J., dissenting). It is reasonable to assume that these three members of the Court came to this conclusion only after reflection and that the opinion was not merely a result of over-reactive hyperbole by those on the losing side of the argument.

In any event, there are other constitutional scholars who have reached the same conclusion, *i.e.,* that the nation's obscenity laws cannot stand in light of *Lawrence.* Laurence H. Tribe, *Lawrence v. Texas: The "Fundamental Right" that Dare not Speak its Name,* 117 Harv. L. Rev. 1893, 1945 (2004); (stating that "... the Court's holding in *Lawrence* is hard to reconcile with retaining the state's authority to ban the distribution to adults of sexually explicit materials identified by, among other things, their supposed appeal to what those in power regard as 'unhealthy' lust, or the state's power to punish adults for enjoying such materials in private, wheth-

er alone or in the company of other adults"); James W. Paulsen, *The Significance of Lawrence*, 41 Hous. Law. 32, 37 (2004) (stating that, "[a]fter *Lawrence*, any law that can be justified only because 'most people think that sort of thing is immoral' may be in constitutional trouble"); Calvin Massey, *The New Formalism: Requiem for Tiered Scrutiny*, 6 U. Pa. J. Const. L. 945, 964–65 (2004) (noting that obscenity laws will be void under *Lawrence* if the decision stands for the idea that moral disapproval is insufficient justification to infringe upon an individual's liberty); Mark Cenite, *Federalizing or Eliminating Online Obscenity Law as an Alternative to Contemporary Community Standards*, 9 Comm. L. & Pol'y 25, 25 (2004) (stating that First Amendment principles favoring autonomy and the *Lawrence* decision "... point toward elimination of obscenity law entirely"); *see also* Gary D. Allison, *Sanctioning Sodomy: The Supreme Court Liberates Gay Sex and Limits State Power to Vindicate the Moral Sentiments of the People*, 39 Tulsa L. Rev. 95, 145–48 (2003) (noting Justice Scalia's prediction, but stating that *Lawrence* will not serve as the basis to invalidate all "morality" laws; however, upon application of the decision to the area of obscenity laws, the author concludes that after *Lawrence* the government could only proscribe child pornography due to the independent governmental interest in protecting the children involved in its production).

Despite defendants' urging, we do not find that *Lawrence* created a "new" and/or "broad" fundamental right to engage in private sexual conduct. Although the *Lawrence* opinion is mixed, certain language suggests that the Court engaged in a rational basis review of the challenged statute. In that light, it is reasonable to find that the court itself did not consider it was addressing a fundamental right. However, that lack of clarity in *Lawrence*

need not be resolved here because we are analyzing the burden that the obscenity laws place on the fundamental rights of privacy and speech of the viewer, which have already been explicitly established in *Stanley v. Georgia*.

■ The *Lawrence* decision, however, is nevertheless important to this case. It can be reasonably interpreted as holding that public morality is not a legitimate state interest sufficient to justify infringing on adult, private, consensual, sexual conduct even if that conduct is deemed offensive to the general public's sense of morality. Such is the import of *Lawrence* to our decision.

### H. Substantive Due Process Analysis

■ A court may hold a statute unconstitutional either because it is invalid "on its face" or because it is unconstitutional "as applied" to a particular set of circumstances. *Ada v. Guam Soc'y of Obstetricians and Gynecologists*, 506 U.S. 1011, 1012, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting). If a statute is unconstitutional as applied, the government may continue to enforce the statute in different circumstances under which it is not unconstitutional. If a statute is unconstitutional on its face, the government may not enforce the statute under any circumstances. A challenger's argument in an as-applied challenge is different from that in a facial challenge. In an as-applied challenge, "the [challenger] contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." *Id.* Therefore, the constitutional inquiry in an as-applied challenge is limited to the challenger's particular situation.

■ For the reasons that follow, we have considered defendants' challenge to the obscenity statutes to be an as-applied challenge. Under those standards, we find

that the obscenity statutes are unconstitutional as applied to the defendants' conduct in this case.

In *Stanley,* the Supreme Court explicitly stated that the right to read, observe, or think about what one pleases in his own home, including obscene material, is "fundamental to our scheme of individual liberty." *Stanley,* 394 U.S. at 568, 89 S.Ct. 1243. That principle of law is not in dispute. Nor has it been disputed by the government that this right is burdened by the federal obscenity statutes, which criminalize the distribution of such material. Thus, the statutes are properly subjected to the strict scrutiny test. *Lawrence v. Texas,* 539 U.S. 558, 593, 123 S.Ct. 2472, 156 L.Ed.2d 508 (2003) (Scalia, J., dissenting) (citing *Washington v. Glucksberg,* 521 U.S. 702, 721, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997)); *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (citations omitted); *Alexander v. Whitman,* 114 F.3d 1392, 1403 (3d Cir.1997). The statutes do not survive that level of exacting constitutional scrutiny as applied to the facts of this case.

Although the government requested and was granted more time to brief the limited issue of the application of the strict scrutiny test to this case, it has failed to identify a compelling state interest justifying the total ban on distribution of obscene material, even in the form of an "in the alternative" argument. Instead, the government states that the rational basis test should be applied, and that under that test, the dual legitimate state interests of: 1) protecting children from viewing obscene materials; and, 2) protecting unwitting adults from

inadvertent exposure to obscene materials, justify a complete ban on its distribution.

A fair reading of the government's brief leads to the conclusion that the government approached this case by focusing on whether the courts have recognized, or should recognize, a fundamental right to commercially distribute obscene material, which is not the issue in this case. As stated above, the issue in this case is whether the federal obscenity statutes place a sustainable burden on an individual's fundamental right, as clearly established in *Stanley,* to read, view, or think what one wants to in the privacy of his own home.

Although we could assume that the government concedes that no compelling interest justifies the federal obscenity laws and end our analysis there, we will give the government the benefit of the doubt and analyze its asserted "legitimate" state interests under the strict scrutiny test. The government has identified two state interests in this case: 1) the protection of unwitting adults from exposure to obscene materials; and 2) the protection of children from exposure to obscene materials.

### a. *Protection of Unwitting Adults*

It cannot be seriously disputed that, historically, the government's purpose in completely banning the distribution of sexually explicit obscene material, including to consenting adults, was to uphold the community sense of morality.[1] That is, to prevent, to the extent possible, individuals from entertaining lewd or lustful thoughts stimulated by viewing material that appeals to one's[2] prurient interests. Har-

---

**1.** The government admitted as much when it advanced as its compelling interest at oral argument "prohibiting the proliferation of obscenity in the community."

**2.** The court's use of the word "one's" is an understatement of great proportion. The pornography industry in the United States is esti-

mated annually to be between $10 billion and $14 billion; generating more revenue than professional football, basketball and baseball put together, more than Hollywood's domestic box office receipts and larger than all the revenues generated by rock and country music recordings. Allison, *supra* at 148.

boring such thoughts, the government deems, is immoral conduct even when done by consenting adults in private. Indeed, one of, if not the, principle underpinning of *Roth v. U.S.*, in which the Supreme Court held that obscenity is not within the area of constitutionally protected speech, was the Court's unquestioned assumption that such material offends the community sense of morality. *Roth,* 354 U.S. at 485, 77 S.Ct. 1304 ("... any benefit that may be derived from [lewd and obscene material] is clearly outweighed by the social interest in order and morality").

After *Lawrence,* however, upholding the public sense of morality is not even a legitimate state interest that can justify infringing one's liberty interest to engage in consensual sexual conduct in private. *Lawrence,* 539 U.S. at 578–79, 123 S.Ct. 2472. Therefore, this historically asserted state interest certainly cannot rise to the level of a compelling interest, as is required under the strict scrutiny test.

Even if the government's asserted interest in keeping unwitting adults from inadvertently viewing this material could rise to the level of being a compelling state interest, the obscenity laws, as applied to these defendants, are not narrowly tailored to advance that interest. As such, they would nevertheless fail the strict scrutiny test.

Access to the video clips for which defendants are being prosecuted is limited to those people who: 1) access defendants' website; 2) join the members-only section of defendants' website, which requires a name and address; 3) pay a membership fee, which requires a credit card; 4) are issued a password; 5) use the password to gain access to the obscene material; and, finally, 6) either view or download the material that they wish to view on a computer. *See* Joint Stipulation of Facts, ¶¶ 11–19. Similarly, the video tapes for which defendants are being prosecuted in

this case could only be accessed by an individual who: 1) accessed defendants' website; 2) reviewed the inventory of videos that were for sale; 3) selected a title to order; 4) inputted personal information, such as a name and an address; 5) submitted credit card information for payment; and 6) executed an order.

Therefore, due to the Internet access technology used by these defendants to distribute the video tapes and video clips charged in this case, the interest of protecting unwitting adults from inadvertent exposure to their material is not advanced at all, let alone by the least restrictive means possible. That is, defendants' mechanism of distributing the materials charged in this case dictate that only those individuals who want to see defendants' films, indeed, want to see them badly enough that they are willing to pay to see them, are able to do so.

Therefore, even if the asserted interest of protecting unwitting adults from inadvertent exposure to the offensive material were found to be a compelling one, a total ban is clearly not the least restrictive means of achieving that goal. In fact, defendants themselves have accomplished the goal of keeping the video tapes and video clips away from unwitting adults by the restrictive method they utilize to allow access to their material. Therefore, because of the manner in which the charged video tapes and video clips are accessed, the federal obscenity statutes, as applied to these defendants, cannot withstand analysis under the strict scrutiny test.

We are not persuaded by the government's argument that a total ban is necessary because, even if the material is initially received for private use, it might later be distributed for viewing other than in private. First, the government can create laws that punish those who distribute obscene material to be viewed other than in

private. Second, there are many activities that the law recognizes a person may constitutionally engage in in his home that could be made criminal if done in public. For instance, a person is free to drink alcohol to the point of inebriation in his home, but could be cited for public intoxication if he left the house. 18 Pa. Cons. Stat. § 5505. A person can possess a firearm without a license in his home, but could be cited for carrying that same item in public. 18 Pa. Cons.Stat. § 6106. A person can walk around naked in his home, but could be cited for public indecency if he left his house in that condition. 18 Pa. Cons.Stat. § 5901.

The federal obscenity statutes are not sustainable under the strict scrutiny test on the ground that they advance the state interest of protecting unwitting adults from exposure to obscene materials. First, that interest is grounded in the advancement of the public morality, which is no longer a legitimate, let alone compelling, state interest. Second, even if the asserted state interest were compelling, that interest is not advanced, by the least restrictive means or otherwise, on the facts of this case, due to the technology and methods used by defendants to restrict access to the video tapes and video clips with which they are charged with distributing.

### b. *Protection of Minors*

Finally, the government asserts that protecting minors from exposure to obscene material is a governmental interest justifying a total ban on its distribution. We find that even if this interest qualifies as a compelling one, as applied to this case, the federal obscenity statutes are not narrowly drawn to serve that interest.

As a general rule, the Supreme Court has not allowed the fact that a determined minor might access inappropriate materials to justify a complete ban on their distribution, thus reducing the adult population to only what is fit for children. *Denver Area Educ. Telecommunications Consortium, Inc. v. Federal Comm. Comm'n,* 518 U.S. 727, 759, 116 S.Ct. 2374, 135 L.Ed.2d 888 (1996) (citations omitted); *see also United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 814, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) ("the objective of shielding children does not suffice to support a blanket ban if the protection can be obtained by a less restrictive alternative"). Rather, along with such appropriate restrictions imposed by the government, such as age requirements, parents are expected to control their children's access to inappropriate items, such as alcohol, tobacco, firearms, and sexually explicit movies. As the Supreme Court recognized in *Ashcroft v. American Civil Liberties Union,* a total ban on the distribution of materials cannot be justified on the assumption that parental supervision of their minor children's activities is an ineffective means of protecting minors from viewing inappropriate material. *Ashcroft v. American Civil Liberties Union,* —— U.S. ——, 124 S.Ct. 2783, 2793, 159 L.Ed.2d 690 (2004) (citing *Playboy,* 529 U.S. at 824, 120 S.Ct. 1878).

In addition to this case law, upon application of the strict scrutiny test to the facts of this case, a complete ban on the distribution of obscene materials for the purpose of keeping them out of the hands of minors is not the least restrictive means of achieving that goal. There are numerous ways to protect minors from exposure to obscene materials that are less restrictive than a complete ban on the distribution of such material to consenting adults.

Access by minors can be limited by regulations that direct when, where and how obscene materials can be displayed commercially and sold. For instance, exposure to minors could be controlled by

establishing age limits, as is done with innumerable other products in the marketplace that are deemed inappropriate for minors, such as alcohol, tobacco, and firearms.

In addition, computer software is available that parents, or other supervising adults, can install on their computers that would effectively filter sexually explicit material when minors are surfing the Internet. This software allows the adult user to disable the filtering device when the computer is being used by an adult, if desired. Such software was recognized as an effective means of shielding minors from exposure to inappropriate material by the Supreme Court in *United States v. American Library Ass'n, Inc.*, 539 U.S. 194, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003). In that case, the Supreme Court upheld, against a First Amendment challenge, the Children's Internet Protection Act, which provided that a public library may not receive federal assistance to provide Internet access unless it installed filtering software to block obscene or pornographic images from access by minors. The Court noted that the library had the ability to easily disable the filter upon the request of an adult patron who wished to view material inappropriate for minors, thereby making the restriction constitutional. *Id.* at 214, 123 S.Ct. 2297 (Kennedy, J., concurring).

Finally, as was required by these defendants, prepayment with credit cards is another effective way to restrict access to inappropriate materials by minors. Significantly, the Federal Communications Commission has already determined that requiring prepayment by credit card effectively restricts minors' access to live "dial-a-porn" messages. The Commission reasoned that because credit cards are not routinely issued to minors,[3] services which require credit card payment are usually limited to adults. The Commission assumed that minors who are issued credits cards in their own names, such as those who are issued a supplementary card to a parent's account, are supervised by adults as to their use of the cards. FCC Enforcement of Prohibitions Against the Use of Common Carriers for the Transmission of Obscene Materials, 50 Fed.Reg. 42,699–01 (Oct. 22, 1985). As has been detailed above, on the facts of this case, defendants themselves have restricted access to the charged materials by minors by requiring that credit card information be entered before viewing the video clips, or ordering the video tapes.

Assuming that protecting minors from exposure to obscene materials is a compelling interest, the federal obscenity statutes, which completely ban the distribution of all such material, including to consenting adults, are not narrowly drawn to advance that interest. Specifically, as applied to the facts of this case, over and above parental supervision, there is software conveniently available to restrict minors' access to sexually explicit materials. In addition, defendants have, in fact, effectively restricted access by minors by requiring credit card information before the materials are accessible, either physically or electronically.

Therefore, the federal obscenity statutes, as applied to defendants, do not survive the strict scrutiny test.

## IV. CONCLUSION

We find that the federal obscenity statutes burden an individual's fundamental

---

**3.** A review of the websites of the major credit card issuers such as Master Card, Visa, American Express and Discover, shows that all require that applicants be at least 18 years of age before being issued a credit card. *See* mastercard.com, usa.visa.com, discovercard.com, and americanexpress.com.

right to possess, read, observe, and think about what he chooses in the privacy of his own home by completely banning the distribution of obscene materials. As such, we have applied the strict scrutiny test to those statutes. The federal obscenity statutes fail the strict scrutiny test because they are not narrowly drawn to advance the asserted governmental interests of protecting minors and unwitting adults from exposure to obscene materials, as applied to these defendants and the facts of this case. Because the federal obscenity statutes are unconstitutional as applied, defendants' indictment must be dismissed.

An appropriate order follows.

### ORDER

Therefore, this ____ day of January, 2005, IT IS HEREBY ORDERED that Defendants' Motions to Dismiss the Indictment [Doc. Nos. 14 and 15] are GRANTED.